IN THE SUPREME COURT OF NORTH CAROLINA

No. 97A20-2

Filed 6 April 2023

STATE OF NORTH CAROLINA

v.

ANTIWUAN TYREZ CAMPBELL

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 272 N.C. App. 554, 846 S.E.2d 804 (2020), finding no error in the trial court's determination that defendant failed to establish a prima facie case of purposeful discrimination during jury selection. On 15 December 2020, the Supreme Court allowed defendant's petition for discretionary review of additional issues. Heard in the Supreme Court on 8 February 2023.

*Joshua H. Stein, Attorney General, by Nicholas R. Sanders, Assistant Attorney General, for the State.*

*Olivia Warren, for defendant.*

*University of North Carolina School of Law, Clinical Programs Civil Rights Clinic, by Erika K. Wilson; and Tiffany R. Wright for North Carolina Black Lives Matter Activists, amici curiae.*

*Cassandra Stubbs, Elizabeth R. Cruikshank, Sarah H. Sloan, Daniel Dubens, and Easha Anand for the Roderick and Solange Macarthur Justice Center and the American Civil Liberties Union, amici curiae.*

BERGER, Justice.

Defendant appeals from a decision of the Court of Appeals concluding that there was no error in the trial court's determination that defendant failed to establish

a prima facie case of racial discrimination during jury selection pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). We affirm.

## I. Factual and Procedural Background

On April 15, 2015, defendant was indicted for first-degree murder and second-degree kidnapping. Defendant's matter came on for trial in the Superior Court, Columbus County, on July 24, 2017.

Defendant's counsel filed a series of motions at the outset of trial, including a motion for complete recordation. Notably, although defendant's counsel stated that this motion was "[j]ust for appeal purposes," defendant's counsel specified she was "not requesting that [recordation] include jury selection." The trial court granted defendant's motion; thus, no transcript of voir dire is available. The record in this matter, as it relates to voir dire, contains only the deputy clerk's jury panel sheet and a transcript of the proceedings after defendant made his *Batson* objection.[1]

In seating twelve jurors for defendant's trial, the jury panel sheet shows that two prospective jurors were excused for cause. In addition, defendant exercised three peremptory challenges to excuse prospective jurors Pamela Moore, Richard Fowler, and Brentwood Parker, while the State excused prospective jurors Timothy Coe and Sylvia Vereen with peremptory challenges. The record contains no evidence of objections by defendant at the time the State used these peremptory challenges.

---

[1] The record in this case is sufficient for appellate review due to the trial court's care in ensuring that exchanges between counsel and the trial court relevant to *Batson* were put on the record.

However, while selecting alternate jurors, the State exercised two peremptory challenges to excuse Justin Staton and Andria Holden. Defendant raised a *Batson* objection to the State's excusal of Ms. Holden, arguing that the State had used three of its four peremptory challenges to strike black prospective jurors and "ha[d] tried extremely hard for every African-American, to excuse them for cause." Defendant further contended that "the last two alternate jurors that were excused showed no leaning one way or the other or indicated that they would not be able to hear the evidence, apply the law, and render a verdict."

After hearing from defendant, the trial court allowed the State to respond. The State noted that although it had race-neutral reasons justifying each peremptory challenge, the trial court was first required to determine that defendant had made a prima facie showing under *Batson*. Defendant agreed that "it's a decision for the [c]ourt at this point." The trial court denied defendant's *Batson* challenge, concluding that defendant had failed to establish a prima facie case even though such a showing "is a very low hurdle."

After determining that defendant had failed to establish a prima facie case, the trial court again asked the State if it would like "to offer a racially-neutral basis" for its peremptory strikes. Because the State noted that offering race-neutral reasons "could be viewed as a stipulation that there was a prima facie showing," the State declined to offer its reasons for the strikes. The trial court again reiterated that "the [c]ourt has found at this point there's not a prima facie showing, and the [c]ourt will

deny the *Batson* challenge."

After a short recess, the trial court repeated that it "d[id] not find that a prima facie case has been established," but nevertheless "order[ed] the State to proceed as to stating a racially-neutral basis for the exercise of the peremptory challenges."

As to the first prospective juror, Ms. Vereen, the State explained:

> [S]he had indicated that she was familiar with Clifton Davis and actually dated his brother, who is a potential witness, and a potential witness who was . . . alleged to have been in the vehicle with . . . defendant on the night of this encounter in those early morning hours.
>
>         . . . .
>
>         . . . [W]e used our peremptory strike based upon blood relation to the people in the area of that community, . . . defendant's blood relation to the people in the area of the Bennett Loop community, and Mr. Davis, his blood brother being the person she dated around the time period or within a few years of this happening, and her being familiar with Mr. Clifton Davis, who is a witness.

Regarding the challenge to Mr. Staton, the State explained:

> [He] made several conflicting statements during the State's questioning to try and ensure if he could be fair and impartial or not.
>
>         . . . [H]e was familiar with [a primary witness to the murder and alleged kidnapping] . . . any concern he may have preconceived notions about who she was and these events, was one of the State's concerns.
>
>         In addition, he stated he needed to hear from both sides . . . [h]e had flip-flopped back and forth or had stated he needed to hear from both sides, he could only hear from the State, he needed to hear from both sides.
>
>         . . . [S]ince he had gone from having to hear both

sides to only hearing one side, being the State, back and forth on multiple occasions, that was a concern.

> Also, he indicated that he had two friends, one who was transgender who was killed in Cumberland County, that friend, he indicated, those events, and the one in California for the girlfriend or female friend he had who had been killed. When the State asked whether that would substantially impair his ability to be fair and impartial as a juror in this case and a trier of fact being presented here for this particular case-in-chief, he indicated it would.

The State provided the following race-neutral reasons for the challenge to Ms.

Holden:

> [S]he was familiar with . . . [people] that are on the potential witness list, they are blood relatives to [a primary witness to the murder and alleged kidnapping] . . . .
>
> And based upon her familiarity with those three names, which are related to the facts in this case and potential witnesses, we did not—from our viewpoint, we wanted to ensure that a potential juror did not bring in outside knowledge or facts into this case about those people they were familiar with and saw socially . . . .
>
> . . .
>
> [A]n additional reason for the peremptory strike . . . was the fact [that] when she was describing her political science background and nature as a student, she was also indicating that she was a participant, if not an organizer, for Black Lives Matter at her current college with her professor, and whether or not that would have any implied unstated issues that may arise due to either law enforcement, the State, or other concerns we may have.

Thereafter, the trial court stated that "the [c]ourt continues to find, as I've already indicated, that there has not been a prima facie showing as to purposeful discrimination." The trial court subsequently entered a written order denying

defendant's *Batson* claim for failure to establish a prima facie showing:

> The [c]ourt, pursuant to the *Batson v. Kentucky* objection made by the [d]efense during jury selection, finds that there was not a prima facie showing made to establish any violations by the State for its exercise of [per]emptory challenges to prospective jurors. The [c]ourt noted that the State excused two jurors by using [its per]emptory challenges before sitting the initial twelve jurors. When the State sought to use a [per]emptory challenge on the second prospective alternate juror, after excusing the previous alternate juror, the [d]efense made a *Batson v. Kentucky* based objection. During the subsequent hearing the [c]ourt found that the [d]efense did not make a prima facie showing.
>
> NOW THEREFORE, IT IS ORDERED, that the [c]ourt finds that the State's use of [per]emptory challenges during jury selection did not constitute a violation of *Batson v. Kentucky*.

At the conclusion of trial, the jury found defendant guilty of first-degree murder and not guilty of second-degree kidnapping. Defendant was sentenced to life imprisonment without parole and timely appealed.

In the Court of Appeals, defendant argued that the trial court erred in concluding that he failed to establish a prima facie case of impermissible racial discrimination during jury selection. *State v. Campbell (Campbell I)*, 269 N.C. App. 427, 838 S.E.2d 660 (2020). A majority of the Court of Appeals found no error. *Id.* at 435, 838 S.E.2d at 666. One judge dissented, contending that the case should be remanded to the trial court "for specific findings of fact in order to permit appellate review of the trial court's decision." *Id.* at 439, 838 S.E.2d at 668 (Hampson, J., concurring in part and dissenting in part).

Defendant subsequently petitioned this Court for a writ of certiorari, which we allowed to remand the case to the Court of Appeals for reconsideration in light of our decisions in *State v. Hobbs*, 374 N.C. 345, 841 S.E.2d 492 (2020) and *State v. Bennett*, 374 N.C. 579, 843 S.E.2d 222 (2020). On remand, a majority of the Court of Appeals once again found no error, and, once again, there was a dissent urging remand to the trial court for additional findings of fact. *State v. Campbell (Campbell II)*, 272 N.C. App. 554, 846 S.E.2d 804 (2020). Defendant appealed from this decision based upon the dissent.

In addition, defendant filed a petition for discretionary review as to additional issues, which was allowed by this Court. Defendant argues that the Court of Appeals erred in holding that there was no error in the trial court's conclusion that he failed to establish a prima facie case of purposeful discrimination during jury selection.

## II.    Standard of Review

"[T]he job of enforcing *Batson* rests first and foremost with trial judges." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). "[T]rial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S. Ct. 1712, 1723 (1986) (emphasis omitted); *see also United States v. Moore*, 895 F.2d 484, 486 (8th Cir. 1990) ("The trial judge, with his experience in voir dire, is in by far the best position to make the *Batson* prima facie case determination.").

Thus, when a trial court rules that a defendant has failed to demonstrate a prima facie case of discrimination, "[t]he trial court's ruling is accorded deference on review and will not be disturbed unless it is clearly erroneous." *State v. Augustine*, 359 N.C. 709, 715, 616 S.E.2d 515, 522 (2005) (citing *State v. Nicholson*, 355 N.C. 1, 21–22, 558 S.E.2d 109, 125 (2002)); *see also Hernandez v. New York*, 500 U.S. 352, 366, 111 S. Ct. 1859, 1870 (1991) (plurality opinion) ("[I]n the absence of exceptional circumstances, we [sh]ould defer to [the trial] court['s] factual findings . . . ."); *Flowers*, 139 S. Ct. at 2244 (describing the "appellate standard of review of the trial court's factual determinations in a *Batson* hearing as highly deferential." (cleaned up)); *United States v. Stewart*, 65 F.3d 918, 923 (11th Cir. 1995) ("When we review the resolution of a *Batson* challenge, we give great deference to the [trial] court's finding as to the existence of a prima facie case.").

## III.    Analysis

### A. *Batson* Claims

In selecting a jury, an attorney may exercise two different types of challenges against potential jurors. First, "attorneys may challenge prospective jurors for cause, which usually stems from a potential juror's conflicts of interest or inability to be impartial." *Flowers*, 139 S. Ct. at 2238. In criminal cases, the grounds supporting a challenge for cause are that the prospective juror:

> (1) Does not have the qualifications required by G.S. 9-3.
>
> (2) Is incapable by reason of mental or physical infirmity of rendering jury service.

(3) Has been or is a party, a witness, a grand juror, a trial juror, or otherwise has participated in civil or criminal proceedings involving a transaction which relates to the charge against the defendant.

(4) Has been or is a party adverse to the defendant in a civil action, or has complained against or been accused by him in a criminal prosecution.

(5) Is related by blood or marriage within the sixth degree to the defendant or the victim of the crime.

(6) Has formed or expressed an opinion as to the guilt or innocence of the defendant. It is improper for a party to elicit whether the opinion formed is favorable or adverse to the defendant.

(7) Is presently charged with a felony.

(8) As a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina.

(9) For any other cause is unable to render a fair and impartial verdict.

N.C.G.S. § 15A-1212 (2021).

In addition, attorneys are afforded peremptory challenges which "may be used to remove any potential juror for any reason—no questions asked." *Flowers*, 139 S. Ct. at 2238. In noncapital cases, each party is permitted to use six peremptory challenges, and "[e]ach . . . is entitled to one peremptory challenge for each alternate juror in addition to any unused challenges." N.C.G.S. § 15A-1217(b)–(c) (2021).

However, the "Constitution forbids striking even a single prospective juror for

a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203, 1208 (2008) (quoting *United States v. Vasquez–Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)). An attorney's "privilege to strike individual jurors through peremptory challenges [ ] is subject to the commands of the Equal Protection Clause," *Batson*, 476 U.S. at 89, 106 S. Ct. at 1719, which forbids the striking of prospective jurors if "race was significant in determining who was challenged and who was not," *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S. Ct. 2317, 2332 (2005). Moreover, "Article I, Section 26 of the North Carolina Constitution likewise bars race-based peremptory challenges" and "[o]ur courts have adopted the *Batson* test for reviewing the validity of peremptory challenges under the North Carolina Constitution." *Nicholson*, 355 N.C. at 21, 558 S.E.2d at 124–25.

When a defendant raises a *Batson* objection, the trial court must engage in a three-step inquiry to evaluate the merits of the objection. First, the trial court must determine whether the defendant has met his or her burden of "establish[ing] a prima facie case that the peremptory challenge was exercised on the basis of race." *State v. Cummings*, 346 N.C. 291, 307–08, 488 S.E.2d 550, 560 (1997) (emphasis omitted) (citing *Hernandez*, 500 U.S. at 359, 111 S. Ct. at 1866). While "the first step [is not] to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts," *Johnson v. California*, 545 U.S. 162, 170, 125 S. Ct. 2410, 2417 (2005), "[t]he prima facie inquiry is a hurdle that preserves the traditional confidentiality of a lawyer's reason for peremptory strikes unless good reason is adduced to invade it."

*Sorto v. Herbert*, 497 F.3d 163, 170 (2d Cir. 2007) (emphasis omitted).

"[A] defendant c[an] make out a prima facie case of discriminatory jury selection by the totality of the relevant facts about a prosecutor's conduct during the defendant's own trial." *Miller-El*, 545 U.S. at 239, 125 S. Ct. at 2324 (cleaned up); *see also Higgins v. Cain*, 720 F.3d 255, 266 (5th Cir. 2013) (emphasis omitted) ("[P]roof of a prima facie case is fact-intensive, and '[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.' " (second alteration in original) (quoting *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723)). A defendant meets his or her burden at step one "by showing that the totality of the relevant facts gives rise to inference of discriminatory purpose." *Batson*, 476 U.S. at 94, 106 S. Ct. at 1721.

"In response to this initial challenge, the prosecutor may argue that the defendant has failed to establish [a] prima facie showing of discrimination." *State v. Clegg*, 380 N.C. 127, 146, 867 S.E.2d 885, 901 (2022). A "prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson* at 97, 106 S. Ct. at 1723 (emphasis omitted).

In addition, "[o]ur prior cases have identified a number of factors" for a trial court to consider at the initial stage of a *Batson* inquiry, including, but not limited to, the race of the defendant, the race of the victim, the race of the key witnesses, repeated use of peremptory challenges demonstrating a pattern of strikes against

black prospective jurors in the venire, disproportionate strikes against black prospective jurors in a single case, and the State's acceptance rate of black potential jurors. *State v. Hobbs*, 374 N.C. 345, 350, 841 S.E.2d 492, 497–98 (2020).

If the trial court finds that a defendant has met his or her burden at step one, then the trial court moves to the second step of the *Batson* inquiry where "the burden shifts to the prosecutor to offer a racially neutral explanation to rebut [the] defendant's prima facie case."[2] *Cummings*, 346 N.C. at 308, 488 S.E.2d at 560 (emphasis omitted) (citing *Hernandez*, 500 U.S. at 359, 111 S. Ct. at 1866). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 111 S. Ct. at 1866. Put another way, "*Batson*'s requirement of a race-neutral explanation means an explanation other than race." *Id.* at 374, 111 S. Ct. at 1874 (O'Connor, J., concurring). "[E]ven if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end-it merely proceeds to step three." *Johnson*, 545 U.S. at 170–71, 125 S. Ct. at 2417.

Finally, at step three, the trial court must "determine the persuasiveness of the defendant's constitutional claim." *Hobbs*, 374 N.C. at 371, 841 S.E.2d at 498

---

[2] Courts may conclude that step one in a *Batson* inquiry is moot if race-neutral reasons are offered "before the trial court rules whether the defendant has made a prima facie showing," *State v. Hoffman*, 348 N.C. 548, 551, 500 S.E.2d 718, 721 (1998) (emphasis omitted). Although defendant argues that the Court of Appeals erred in concluding step one was not moot in this case, defendant abandoned this argument. *See* N.C. R. App. P. 16(b), 28(a).

(quoting *Johnson*, 545 U.S. 171, 125 S. Ct. at 2417–18). The "burden is, of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination." *Batson*, 476 U.S. at 93, 106 S. Ct. at 1721 (cleaned up). "The ultimate inquiry is whether the State was motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2244 (cleaned up). Thus, "[n]o matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race." *Hernandez*, 500 U.S. at 375, 111 S. Ct. at 1874 (O'Connor, J., concurring).

## B. Discussion

Defendant argues that the Court of Appeals erred in affirming the trial court's determination that defendant failed to make a prima facie showing of purposeful discrimination.[3] Specifically, defendant contends that the State's use of three out of four of its peremptory strikes against black jurors was sufficient to establish a prima facie case.

Jury selection is typically not recorded by the court reporter in non-capital trials. N.C.G.S. § 15A-1241(a) (2021). However, voir dire must be recorded if requested by a party or the trial judge. N.C.G.S. § 15A-1241(b). Defendant here did

---

[3] In this appeal, we do not address whether defendant established all of the elements of a successful *Batson* claim because, as defendant's counsel conceded at oral argument, this case "is a step one case." Oral Argument at 13:24, *State v. Campbell* (No. 97A20-2) (Feb. 8, 2023), https://www.youtube.com/watch?v=gxGNuMocyT0 (last visited Mar. 17, 2023).

not move for recordation of jury selection and specifically requested that jury selection not be recorded. Thus, the record before us does not contain the intimate details of the interaction between counsel and prospective jurors.[4]

However, "[w]hen a party makes an objection to unrecorded statements or other conduct in the presence of the jury, upon motion of either party the judge must reconstruct for the record, as accurately as possible, the matter to which objection was made." N.C.G.S. § 15A-1241(c). One could argue that the trial court's order for the State to offer race-neutral reasons may have been an attempt to comply with this statute or to facilitate appellate review. Whatever the reason, the *Batson* inquiry should have concluded when the trial court first determined that defendant failed to make a prima facie showing.

The State appropriately objected to the trial court's attempt to move beyond step one. Where "the trial court clearly ruled there had been no prima facie showing . . . before the State articulated its reasons," this Court does "not consider whether the State offered proper, race-neutral reasons for its peremptory challenge." *State v. Hoffman*, 348 N.C. 548, 552, 500 S.E.2d 718, 721 (1998) (emphasis omitted). Accordingly, we do not consider at step one the State's *post facto* reply to the trial court's request for a step two response.

Thus, we review only the trial court's initial determination that defendant

---

[4] This, perhaps, is another reason that great deference is given to our trial courts on *Batson* inquiries.

failed to make a prima facie showing of purposeful discrimination. *Id.* We do so by looking at the totality of the information in the record relevant to step one of a *Batson* inquiry, giving appropriate deference to the trial court's determination.

Here, the record shows that both defendant and the victim, as well as at least one key witness, were black; the State exercised two peremptory strikes during selection of the initial twelve jurors, one on a white prospective juror and one on a black prospective juror; and the State exercised two peremptory strikes during alternate juror selection, both on black prospective jurors.[5] Defendant has failed to produce any additional facts or circumstances for consideration.

Defendant argues that the State's exercise of three out of four peremptory strikes against black prospective jurors is sufficient to establish a prima facie case of purposeful discrimination. Specifically, defendant asserts that our opinion in *State v. Barden*, 356 N.C. 316, 572 S.E.2d 108 (2002) can be read to mean that a 71.4% strike rate—the corollary to a 28.6% acceptance rate—establishes a prima facie case, and that the 75% strike ratio in this case therefore compels reversal. Defendant's argument is without merit.

In *Barden*, this Court calculated the State's acceptance rate of black prospective jurors to be 28.6% and compared that rate to cases where this Court "held

---

[5] We note that, when reviewing the totality of the relevant evidence, a trial court is not required to ignore statements made by prospective jurors which may provide a readily apparent and legitimate basis for the exercise of the peremptory strike. Here, however, no such information is available because voir dire was not recorded.

that a defendant had failed to establish a prima facie case of discrimination." *Barden*, 356 N.C. at 344, 572 S.E.2d at 128 (emphasis omitted). This Court recounted that defendants had previously failed to establish prima facie cases "where the minority acceptance rate was 66%, 50%, 40%, and 37.5%," but nevertheless held that although "the issue [wa]s a close one," the trial court erred in concluding the defendant failed to establish a prima facie case where the acceptance rate was 28.6%. *Id.* at 344–45, 572 S.E.2d at 128 (citations omitted).

While it is correct that this Court has stated that "a numerical analysis . . . can be useful in helping us and the trial court determine whether a prima facie case of discrimination has been established," such an analysis is not dispositive when reviewing the totality of the relevant facts available to a trial court. *Id.* at 344, 572 S.E.2d at 127 (emphasis omitted).

Reliance on a single mathematical ratio, standing alone in a cold record, is insufficient here. Not only would such an approach result in this Court "splitting hairs," *id.* at 344, 572 S.E.2d at 128, but it would also demand that we abandon all pretense of deference to the trial judge, who, "with his experience in voir dire, is in by far the best position to make the *Batson* prima facie case determination," *Moore*, 895 F.2d at 486.

Our decision in *Barden* was not an invitation for defendants to manufacture minimal records on appeal and force appellate courts to engage in a purely

mathematical analysis.[6]  We expressly reject defendant's suggested interpretation, as it would "remove[ ] the defendant's burden and eliminate[ ] the first step of *Batson.*" *Bennett*, 374 N.C. at 616, 843 S.E.2d at 246 (Newby, J., dissenting). [7]

Finally, defendant argues the dissent below concluded that "this case requires more explanation and context for the trial court's determination [that] no prima facie showing had been made." *Campbell II*, 272 N.C. App. at 568, 846 S.E.2d at 813–14 (Hampson, J., concurring in part and dissenting in part).  Specifically, defendant contends that the trial court failed to sufficiently explain its reasoning as required by our decision in *Hobbs* and that this Court should therefore "grant the limited remedy of remanding this case to the trial court for specific findings of fact in order to permit appellate review of the trial court's decision." *Id.* at 568, 846 S.E.2d at 814.

As the dissent below noted, in *Hobbs* this Court "was not addressing the prima facie inquiry," and it is therefore both factually and legally distinguishable from the present case.  *Id.* at 567, 846 S.E.2d at 813 (citing *Hobbs*, 374 N.C. at 357–59, 841

---

[6] It is also worth noting that defendant's reliance in *Barden* is further misplaced because defendant's argument conflates strike rates, acceptance rates, and strike ratios.  The State's exercise of three of its four peremptory challenges on black prospective jurors yields a strike ratio of 75%.  However, because the record that defendant presents to us does not disclose the total number of black prospective jurors in the pool of prospective jurors or the racial make-up of the jurors who were seated, this metric reveals nothing about the State's strike rate or acceptance rate.

[7] As stated, we review a trial court's finding at step one to determine whether it was "clearly erroneous."  *State v. Augustine*, 359 N.C. 709, 715, 616 S.E.2d 515, 522 (2005). Because *Batson* inquiries involve analysis of the totality of relevant circumstances, it is extremely unlikely that a single mathematical calculation will be sufficient for a defendant to demonstrate such clear error or compel an appellate court to abandon all deference to the trial court.

S.E.2d at 502). In *Hobbs*, this Court reviewed the trial court's *Batson* ruling, but did not engage in a step one analysis because that portion of the inquiry was moot. *Hobbs*, 374 N.C. at 355, 841 S.E.2d at 500–01. The *Batson* review in *Hobbs* instead focused on steps two and three and the trial court's ultimate determination that the State's peremptory challenges were not based on race. *Id.* at 356, 841 S.E.2d at 501. Notably, the record in *Hobbs* included evidence regarding the racial composition of the venire and the acceptance and rejection rates of both white and black prospective jurors. *Id.* at 348, 841 S.E.2d at 496.

Here, unlike in *Hobbs*, we are concerned only with step one of the *Batson* inquiry. Defendant has provided no case law from this state or any other jurisdiction establishing that a trial court is required to enter extensive written factual findings in support of its determination that a defendant has failed to establish a prima facie case, and we decline to impose such a requirement.

## IV. Conclusion

"An appellate court is not required to, and should not, assume error by the trial judge when none appears on the record before the appellate court." *State v. Alston*, 307 N.C. 321, 341, 298 S.E.2d 631, 645 (1983) (quoting *State v. Williams*, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968)). Following this principle, the Court of Appeals concluded that "defendant has not shown us that the trial court erred in its finding that no prima facie showing had been made." *Campbell II*, 272 N.C. App. at 563–64, 846 S.E.2d at 811 (majority opinion) (emphasis omitted).

Based on a review of the record in this case and the arguments of the parties, we agree that defendant has failed to demonstrate that the trial court's determination that defendant failed to prove a prima facie showing of racial discrimination was "clearly erroneous." *Augustine*, 359 N.C. at 715, 616 S.E.2d at 522. The decision of the Court of Appeals is affirmed.

AFFIRMED.

Justice EARLS dissenting.

Justice Marshall observed that "[m]isuse of the peremptory challenge to exclude black jurors has become both common and flagrant. Black defendants rarely have been able to compile statistics showing the extent of that practice, but the few cases setting out such figures are instructive." *Batson v. Kentucky*, 476 U.S. 79, 103 (1986) (Marshall, J., concurring). He went on to highlight cases from a variety of state and federal courts that shed some light on what was known at the time about the use of peremptory challenges to exclude potential Black jurors from being empaneled as a juror for a trial. Today, this Court returns to the practice of refusing to acknowledge what is in plain sight and turns a blind eye to evidence of racial discrimination in jury selection in this case by contorting the doctrine and turning the *Batson* test into an impossible hurdle. *Cf. State v. Clegg*, 380 N.C. 127, 170 (2022) (Earls, J., concurring) (demonstrating that from 1986 until 2022, this Court never reversed a conviction based on a *Batson* challenge to a prosecutor's use of a peremptory challenge).

As the majority explains, at the time that Mr. Campbell's defense counsel raised a *Batson* challenge during the second day of jury selection, the State had used three of its four total peremptory strikes to exclude African American jurors. The trial court denied the *Batson* objection, concluding that Mr. Campbell had failed to make a prima facie showing of discrimination under *Batson*'s Step 1, but it inquired whether, "out of an abundance of precaution," the State nevertheless "wish[ed] to

offer a racially-neutral" reason for its peremptory challenges. The State declined, explaining it had "reasons [it] could attribute, but . . . if [it were to] give the race-neutral reasons[,]" that "could be viewed as a stipulation there was a *prima facie* showing." The trial court accepted this explanation and noted, "again, the [c]ourt has found at this point there's not a *prima facie* showing, and the [c]ourt will deny the *Batson* challenge."

Later that day, however, the trial court explained that "upon further reflection, although I do not find that a prima facie case has been established for discrimination pursuant to *Batson*, in my discretion, I am still going to order the State to . . . stat[e] a racially-neutral basis for the exercise of the peremptory challenges in regards to" the challenged jurors. The State then offered its reasons for the peremptory strikes, including that one of the jurors was "a participant, if not an organizer, for Black Lives Matter at her current college."

The majority admonishes that "the *Batson* inquiry should have concluded when the trial court first determined that defendant failed to make a prima facie showing." But the inquiry did not stop there. Instead, the trial court ordered the State to share its race-neutral justifications for its peremptory challenges, which is exactly what would have been required under Step 2 of *Batson*. But because the trial court already rejected Mr. Campbell's *Batson* challenge, concluding that he did not make a prima facie showing of discrimination under Step 1, the majority "do[es] not consider at step one the State's *post facto* reply to the trial court's request for a step two

response."

This Court has addressed similar circumstances before. For example, in *State v. Smith*, 351 N.C. 251 (2000), the trial court rejected the defendant's *Batson* challenge, but the court permitted the State to explain its race-neutral reasons for the record. *Id.* at 262. This Court held that "[w]here the trial court rules that a defendant has failed to make a *prima facie* showing, . . . [appellate] review is limited to whether the trial court erred in finding that defendant failed to make a *prima facie* showing, even if the State offers reasons for its exercise of the peremptory challenges." *Id.*

Similarly, in *State v. Williams*, 343 N.C. 345 (1996), after the trial court denied the defendant's *Batson* challenge, it granted the defendant's request that the State provide its reasons for its peremptory challenges for the record. *Id.* at 357. This Court explained that when the State provides its reasons for juror challenges prior to the trial court's ruling on whether a prima facie case has been established "or if the trial court requires the prosecutor to give his reasons without ruling on the question of a *prima facie* showing, the question of whether the defendant has made a *prima facie* showing becomes moot," and the trial court must proceed to Step 3 of the *Batson* analysis. *Id.* at 359. But the Court explained that this "rule d[id] not apply in [*Williams*] because the trial court made a ruling that defendant failed to make a *prima facie* showing before the prosecutor articulated his reasons for the peremptory challenges." *Id.* As such, the Court held that "review [was] limited to whether the

trial court erred in finding that defendant failed to make a *prima facie* showing." *Id.*

Thus, in similar circumstances where a trial court rules that a prima facie showing has not been made and subsequently orders the State to provide its race-neutral reasons for the strikes or the State proffers these reasons voluntarily, this Court has held that the prima facie showing is not moot and appellate review is limited to whether the trial court's conclusion on Step 1 of the *Batson* analysis is correct. However, the facts of this case demonstrate the fundamental flaw in the reasoning of *Smith*, *Williams*, and the majority's decision here.

Imagine, for example, that when ordered to provide his race-neutral reasons for his peremptory challenges, the prosecutor in Mr. Campbell's case stated, among other reasons, that he struck one of the jurors because of her race. Once this plainly unconstitutional sentiment has been expressed, it could hardly be argued that the trial court is not obligated under *Batson* to consider the prosecutor's statements under Step 3 of the *Batson* analysis, regardless of whether the defendant initially failed to make a prima facie showing of racial discrimination. Such a result would be absurd in light of a blatant admission of racial discrimination. This means that when a prosecutor provides supposedly race-neutral reasons for peremptory challenges, the trial court has some obligation to consider the substance of those statements.

Indeed, when the prosecutor's "race-neutral" reasons are actually indicative of racial bias in jury selection, the prosecutor has himself stated precisely that which was the defendant's burden to demonstrate at *Batson* Step 1. The prosecutor's

proffered reasons obviate the initial requirement that the defendant make a prima facie showing of discrimination. This is particularly true where, as here, the trial court *orders* the prosecutor to provide its race-neutral reasons. A court cannot on the one hand insist that the prima facie showing requirement from *Batson* Step 1 has not been met while, on the other hand, compel the State to provide race-neutral reasons for its jury strikes, precisely as a trial court would be required to do under *Batson* when the prima facie burden in Step 1 has been met. Feigning that the trial court's conduct in this case is materially different from a scenario in which the trial court actually proceeds to *Batson* Step 2, *or* prior to making a finding with respect to the defendant's prima facie showing, requires the State to provide its race-neutral reasons for its challenges, meaning that the defendant's prima facie burden has become moot, defies logic, and this Court should recognize as much.

"America's trial judges operate at the front lines of American justice. In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). Trial courts cannot be permitted to spurn this responsibility through hyper-technical constructions of *Batson* that lack common sense and are at odds with *Batson*'s central purpose of preventing racial discrimination in jury selection. *See Batson*, 476 U.S. at 85–87 (majority opinion).

This case also demonstrates Justice Marshall's prescient concern, expressed in his concurring opinion in *Batson*, that "[m]erely allowing defendants the opportunity

to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." *Batson*, 476 U.S. at 105 (Marshall, J., concurring).

In this case, the prosecutor's explanation for excluding an African American juror in part based on her involvement with Black Lives Matter, which was revealed only after the trial court ruled that Mr. Campbell failed to make a prima facie showing, could not have been known to Mr. Campbell when attempting to meet his burden during *Batson* Step 1. This excuse for excluding a juror is "just another [way of expressing] racial prejudice." *Batson*, 476 U.S. at 106.

It is a troubling and illogical proposition to assert that it is race-neutral for a prosecutor to excuse a Black woman as a prospective juror on the grounds that she cannot be unbiased due to her association with a predominately Black organization that brings to light "what it means to be [B]lack in this country" and "[p]rovide[s] hope and inspiration for collective action to build collective power to achieve collective transformation." Garrett Chase, *The Early History of the Black Lives Matter Movement, and the Implications Thereof*, 18 Nev. L.J. 1091, 1096 (2018) (quoting Jennings Brown, *One Year After Michael Brown: How a Hashtag Changed Social Protest*, Vocativ (Aug. 7, 2015, 5:41 PM), http://www.vocativ.com/218365/michael-brown-and-black-lives-matter). The majority's only way to overcome the natural force of this race-conscious rationale is to pretend it did not happen.

In contrast, in *Cooper v. State*, 432 P.3d 202 (Nev. 2018), the Supreme Court

of Nevada held that a prosecutor's questions to potential jurors about whether they had strong opinions about Black Lives Matter were race-based. *Id.* at 206. The court expressed the "concern[ ] that by questioning a venire[ ]member's support for social justice movements with indisputable racial undertones, the person asking the question believes that a 'certain, cognizable racial group of jurors would be unable to be impartial, an assumption forbidden by the Equal Protection Clause.' " *Id.* (quoting *Valdez v. People*, 966 P.2d 587, 595 (Colo. 1998)). As in *Cooper*, the prosecutor's reliance on the juror's Black Lives Matter involvement appears to have had "minimal relevance to the circumstances of this case." *Id.* But the trial court made no findings regarding the relevance of this stated reason to the State's case.

I would hold that the Step 1 requirement that Mr. Campbell demonstrate a prima facie case of discrimination was rendered moot when the trial court required the prosecution to explain its reasons for excluding the three Black jurors. At that point, the trial court needed to examine all of the evidence and the circumstances to assess whether the prosecutor's strikes were motivated in part by impermissible race-based considerations. I would accordingly vacate the decision of the Court of Appeals and remand to the trial court to make proper findings regarding whether the prosecutor's use of three of four peremptory challenges to excuse Black prospective jurors was in violation of *Batson* based on all of the evidence, including the prosecutor's proffered justifications. Therefore, I respectfully dissent.